PEOPLE *v.* COLBATH.

1. CRIMINAL LAW—EVIDENCE—AGE—COMPETENCY.
   Though as a general rule a person is competent to testify to his own age, where it appears that he has no recollection of his mother, and no information on the subject from relatives, or other members of his family, his opinion, based on the statements of other persons, is not evidence, and the statements of such persons are hearsay.

2. SAME—CROSS-EXAMINATION—MATERIALITY.
   Where a witness has testified to the age of prosecutrix in statutory rape, and stated that there is a record thereof, and it has been given to defendant's counsel, the witness cannot be cross-examined as to the ages of the other children shown by the record, unless it is shown how such cross-examination is material.

3. SAME—INSTRUCTIONS.
   For the court, in his charge in a prosecution for statutory rape, to refer to prosecutrix as "the little girl," if error, is harmless.

MOORE, C. J , and BLAIR and OSTRANDER, JJ., dissenting.

Error to Bay; Shepard, J. Submitted February 16, 1905. (Docket No. 269.) Decided September 19, 1905.

Iram E. Colbath was convicted of statutory rape and sentenced to imprisonment for not less than six and not more than twelve years in the branch of the State prison at Marquette. Affirmed.

*Pierce & Kinnane,* for appellant.

*John E. Bird,* Attorney General, *Brakie J. Orr,* Prosecuting Attorney, and *R. T. Waddle,* Assistant Prosecuting Attorney, for the people.

HOOKER, J. It is the general rule that a person is competent to testify to his own age. When, however, it appears that he has no recollection of his mother, and has no information upon the subject from his relatives or other members of the family, his opinion, based on the statements of other persons, is not evidence, while the statements of such persons are hearsay. In this cause the defendant's counsel sought to introduce evidence of such statements through cross-examination of the witness, who had not been asked upon direct examination to state her age. It was inadmissible, and the court did not err in excluding it. The fact that she was defendant's victim, or even complaining witness, does not affect the question, which is measured by the rule applicable to any witness.

The sister of defendant's alleged victim testified to her age, and stated that she was present at her birth, when she, the witness, was fifteen years old. On cross-examination she was asked if there was a record of Eva's birth, and replied, " Yes; we have it." It was developed that pending these proceedings her brother had written a letter, from which witness' husband had made a record. It is inferable that this letter gave the ages of the children. The letter was not in court, and it does not appear what the record made by the witness' husband showed. This record was produced and given to defendant's counsel, who

did not try to introduce it, but who sought to ask questions concerning it with reference to other children. The court said that he did not see how this was material, and counsel does not seem to have cared to enlighten him. Nor has he enlightened us as to its bearing or importance. This he should have done, if he made any claim for it. If there was occasion to go into the ages of the other children, it could easily have been made to appear.

The fact that in his charge the court referred to Eva as "the little girl" was not necessarily error. If she was a little girl, and we may presume that she was, or he would not so have described her, it was manifest to all who saw her, and, if she was really a large girl, the jury could not be misled by this description in their presence at the time; and erroneously calling her a little girl would not be likely to injure the respondent with the jury.

The judgment should be affirmed.

CARPENTER, MCALVAY, GRANT, and MONTGOMERY, JJ., concurred with HOOKER, J.

BLAIR, J. (*dissenting*). The respondent, a piano tuner, was convicted in the Bay circuit court upon an information charging statutory rape upon Eva Gable, a female child under the age of 16 years, to wit, of the age of 14 years, on the 9th day of April, 1904. Eva first met the respondent in the parlor of a hotel at Cheboygan, on the 9th of April, 1904. Respondent began a conversation with her, and after some casual remarks invited her to go to Bay City with him, which she finally consented to do.

"He said I could stay at his home a while, and, if I wanted to, he would get me a place to work.. * * * Coming down on the train, he asked me how old I was, and I told him that I had been told I was 17, and he said I didn't look to be that old. He didn't think I was."

Respondent took Eva to his rooms in a block in Bay City, went out and got her some fruit, and then went away, telling her he was going to the hotel for the night. He came back in about two hours.

"When he came back, I was in bed, and I had taken all my clothes off, and had only my nightdress on. He came into the bedroom. I said to him, 'I thought you were going to stay at the hotel tonight,' and he said, 'No, I thought I would come back and stay with you.' I says, 'Where will you sleep?' He says, 'I will sleep here.' I asked him where I would sleep, and he says, 'You will sleep here, too.' I says, 'I ain't going to stay here, if you are.' He says, 'You will have to.' I tried to get out of bed, and he held me in bed. He had one hand on my wrist and the other on my shoulder. I tried to get up, and he would not let me. Then he took one arm off me, and then undressed himself and got into bed. When he got in bed, I did not do or say anything. I did not try to get away or keep him away from me. He lay in bed about 10 minutes, and then misused me. I tried to get out of bed, and he would not let me. He had intercourse with me twice before the police came, in about 10 minutes. About half an hour afterwards the officers came to the door. We were both still undressed. The officers knocked on the door, and Colbath got up and went out into the room. Then he came back and told me to get up, and I asked him if it was anybody at our door, and he said, 'Yes.' He said he thought it was a policeman. He dressed first, and I got up and got dressed, and he told me to stick to it that I was 17, and to tell them that we' were not in bed, and that he was going to take me down to the depot. He said, if I told them that we had both been in bed, they would send us both over the road."

Respondent admitted that his purpose in inviting Eva to accompany him to Bay City was to have sexual intercourse with her, but testified that the coming of the police prevented his carrying out his design. Respondent's counsel concede the correctness of the court's rulings and instructions as to the question whether respondent had sexual intercourse with Eva, but contend that seriously prejudicial error was committed in his rulings upon the admissibility of testimony as to Eva's age and the form of his references to her in his charge. In order to properly discuss the legal questions involved in this branch of the case, it is necessary to set out quite fully portions of the testimony. The only evidence as to the age of the com-

plaining witness, Eva Gable, was given by herself and her married sister, Mrs. Ella Bonner.

Eva testified on her direct examination that she was born in Troy, Canada; that her mother was dead, and she did not know where her father was; that, after her home was broken up and her father went away, she went to Mrs. Eastlake's to live.

" I stayed with her about a year. She put me in the hands of Mr. Brown, who took charge of young children. He kept me in his house for a while, about three months; then he put me with a schoolteacher, Miss Walker, and I remained with Miss Walker about eight years. I afterwards went to live with MacElroys. They moved to Wolverine, up north here in Michigan, and I accompanied them. This was last June. Afterwards the MacElroys went from Wolverine to Cheboygan, and I did not go with them, because I was working at a place. Where I was working, the woman didn't want me to leave until a few days after they went, and they told me they would write me and tell me when to come. I expected to go from Wolverine to Cheboygan. They left on Monday, and I left on Friday. * * *

" Q. Do you know how old you are ?

" A. Yes, sir.

" Q. How old are you ? From whom had you been told you were 16 or 17 ?

" A. Mrs. Brown. She was the reeve's wife in Canada. I have ascertained my true age from my sister, who is here."

On cross-examination she testified as follows:

" I have no recollection of my mother. My father left us. I have no recollection of his leaving. I then lived with a neighbor woman, Mrs. Eastlake. I remember that distinctly. I was old enough to remember that. I lived with Mrs. Eastlake about a year. She lived a litle ways out of Troy. After living a year with Mrs. Eastlake I went with the reeve, Mr. Brown, who looks after children whose parents are dead or have deserted them. I remember it distinctly that I lived with him about a year. After living with Mrs. Eastlake for a year, and Mr. Brown for another year, I lived with Miss Walker for eight years,

141 Mich.—13.

and then went to live with a family named MacElroy, and came with this family to Michigan last June, and lived with them until they went to Cheboygan. I told Mr. Colbath that, so far as I knew, I was 17 years of age. I knew this from what people told me that I lived with.

"*Q.* As I understood you, before you came here to Michigan, some party over there told you you were 16 years old past. Who was the party that told you you was 16 years old past?

"*A.* Mrs. Brown told me two years ago that I was 15. (Objected to as immaterial, what different people have told her. She could not give any consent, *and could not tell her age.*)

"*The Court:* This examination was made on the other side. It is hearsay and the statement of somebody else, and I think it would be incompetent what somebody else told her. If it is not competent on one side, it is not competent on the other.

"*Mr. Pierce:* Up to this stage of the examination, the people having finished the direct examination of this complaining witness, there has been no record produced or anything produced showing conclusively her age. That question in this case, of course, is largely speculative. Isn't it the rule that you can gather from the neighbors, that you gather from the persons with whom you are associated declarations made by them as to the age in cases of this kind and character, and that has a tendency to show the fact in the absence of a record?

"*The Court:* No; for the reason that if it was from her own mother's statement, or her own father's statement, or her sister's statement, or somebody that had a direct knowledge or might be assumed had a direct knowledge, there might be more claim for it; but you cannot try the issue here in this case on hearsay as to neighbors' knowledge, or on what they base their knowledge, or whether they had any information upon it. It is the baldest hearsay what neighbors say in regard to age. It is outside of anything that would be in evidence as to age. The young lady's mother died when she was 2 years of age. She had no knowledge of her mother. Afterwards her father deserted the family, and she has practically little knowledge of him, if any, during the younger portion of her life. She lived, according to her testimony, with a woman named Brown, and, as it appears from the cross-examination, Mr. Brown had charge of persons

under the unfortunate circumstances she was in. She was advised after living with him, after a period of eight years, by him, that before she came to Michigan she was 15 years of age, which would make her 17 now.

"*Mr. Pierce:* Isn't it a strong circumstance to establish the fact of her age, and isn't it admissible for that reason?

"*The Court:* I don't think so. (Exception taken.)

"It will be a year ago next month, June, since I went to live with the MacElroys in Wolverine, Michigan."

Mrs. Ella Bonner, Eva's sister, testified that their mother died May 5, 1894; that she was with her mother when Eva was born, which occurred on the 26th day of July, 1889; that witness was at that time 15 years old; that there were seven girls and three boys in the family.

"I last saw Eva about four years before she went to Michigan. After my mother died and my father left home, three months after she died, I kept Eva until fall. We got places for them that we could get places for, and them we didn't get places for a lady went to the council and took them. The council took care of Eva; that is, the reeve found a place for her and put her with Mrs. Eastlake. She stayed there a year, and then went to Mr. Brown's, the reeve. I don't know how long she stayed at Mr. Brown's. After she left Brown's she went to Miss Walker's. I don't know how long she stayed there. I don't know where she went next."

Cross-examination by Mr. De Foe:

"*Q.* There isn't any record of your sister Eva's birth?
"*A.* Yes, sir, we have it.
"*Q.* Where?
"*A.* My brother had part of it, and I have part of it.
"*Q.* Produce it.
"*A.* I haven't got it with me. The Captain has got it.
"*Q.* Has he got a record of Eva's birth?
"*A.* Yes, sir; it is all on a paper.
"*Mr. Anneke:* It is a statement that you made out?
"*The Court:* That is improper.
"*Q.* The paper Capt. Wyman has got is one he made out himself?
"*A.* No, sir; it is my husband's writing. My husband made it out not long ago—about four or five weeks.

"*Q.* When you heard about this trouble, you and your husband made out this paper?

"*A.* Yes, sir. My husband had my brother send it. He sent the ages in his letter. I wrote to him.

"*Q.* That is all you know about it?

"*A.* No, sir; I know she was born on the 26th.

"*Q.* Did you get that information from your brother through the letter?

"*A.* No. I know it was the 26th.

"*Q.* As to the record, did you get that information through your brother writing you a letter? Did you get that information as to the record as to the date of Eva's birth and the rest of your family through a letter received from your brother? Do you understand the question? You received a letter from your brother?

"*A.* Yes, sir.

"*Q.* In that letter he went on and made a statement as to the ages of the different children?

"*A.* Yes, sir; I haven't got that letter with me. I left it at home.

"*Q.* When your husband made up the record that Capt. Wyman has, he made it from this record received from your brother?

"*A.* Part of it.

"*Q.* What part of it did he make up from the letter?

"*A.* Part of my younger sister's. I had the rest. I haven't got the record with me. It is at home.

"*Q.* If you had the record, Capt. Wyman was over there looking up this girl's age, was he not? Was Capt. Wyman over there to your home making inquiries in regard to your sister's age? Why do you hesitate to answer that question? Did Capt. Wyman bring that record?

"*A.* No, sir; he didn't bring it. I brought it myself. The captain has it now.

"*Mr. De Foe:* Produce the record.

"*Mr. Anneke:* Can you produce it?

"*A* I can, if the captain—

"*The Court.* Can you produce it, Mr. Anneke?

"*Q.* In whose handwriting is that record?

"*A.* My husband's.

"*Mr. Anneke:* I am asked to produce what he calls a record. It is merely a statement in the handwriting of some person. It is not competent to put in testimony. (Paper handed to counsel.)

"*Q.* That record is made in your husband's handwriting?

"*A.* Yes, sir; it was made four or five weeks ago. My husband got the record from my brother in a letter.

"*Mr. Anneke:* Before there is any more cross-examination in regard to that document, I submit it should be settled whether or not the subject of the cross-examination is competent to be put in testimony. *

"*The Court:* It is not in evidence.

"*Mr. De Foe:* The only thing I am eliciting is to test this woman's knowledge as to the girl's birth.

"*The Court:* As to the rest of the children, it is not material. She has testified that she personally knows as to this girl. (Exception taken.)

"*Q.* You did not have the record at your home as to this girl?

"*A.* No, sir. I was asked by Capt. Wyman if I had a record of Eva's birth, and I didn't have any. I made no memorandum of my sister's birth at the time she was born, and I don't know whether there was ever any record made of Eva's birth or not.

"*Q.* This record that Capt. Wyman had—

"*Mr. Anneke:* I object to any more questions being asked in relation to that record, for the reason that it is nothing that could be put in testimony in this case, and could not be the subject of cross-examination.

"*The Court:* It is not competent evidence. It is all hearsay. This record is not in evidence. It won't be in evidence. It is entirely immaterial as to the rest of the family, and she testified from personal knowledge as to the age of the girl in this case. (Exception taken.)

"Up to the time this transaction took place over here in Michigan, I had nothing to call my attention to this girl. There were seven girls and three boys in our family. There was a record of two of the first members of the family.

"*Q.* Where is that record?

"*The Court:* I don't see how that is material. It don't affect this case. (Exception taken.)"

In the course of his charge to the jury the court referred to the complaining witness as follows:

"You have heard the testimony of *the little girl,* * * * and he tells you that his purpose in doing so was to have intercourse with *this child.* * * * It is

claimed on the part of the prosecution that the testimony of *the little girl* shows  *  *  *.   As to whether or not *this little girl* told the truth  *  *  *.   You have seen *the little girl* on the stand yourself.  *  *  *   You have heard the testimony of the officer, Mr. Radcliffe, who saw this man get off the car with *the little girl;* his attention being attracted by the *apparent age of the girl.*"

It is apparent, we think, from this record, that the chief, if not the only, reasonable defense which the respondent had upon the merits was that the complaining witness was above the age of 16 years.   The age of Miss Gable, therefore, presented the supreme question in the case, and it was essential that the respondent's rights should be carefully protected by the court in his rulings upon the introduction, admissibility, and relevancy of testimony, and his instructions as to the determination of that question by the jury.   Miss Gable was a competent witness as to her own age, and we think the jury should have been explicitly so informed.   *Cheever* v. *Congdon,* 34 Mich. 296; *Morrison* v. *Emsley,* 53 Mich. 564; *People* v. *Elco,* 131 Mich. 519.   While the trial judge did not instruct the jury that they could not consider the testimony of Miss Gable upon the question of her age, we think the jury were likely to understand from the proceedings above set forth that her entire testimony upon this subject was hearsay; and this probability should have been counteracted by explicit instructions from the court.

The only reason explicitly assigned by Miss Gable for her belief that she was 17 was that Mrs. Brown had told her so.   The prosecutor, after himself putting this evidence in the record, objected to the questions of respondent's counsel upon the same subject, assigning as one reason that she (Miss Gable) "could not tell her age."   The court ruled that the statements of Mrs. Brown were hearsay, and, as these statements were the only basis assigned by Miss Gable for her belief as to her age, the jury would naturally infer that there was no competent evidence in the case that she was over 16.   The testimony of Miss

Gable, aside from the statement of Mrs. Brown, would have warranted the jury, if they believed it to be accurate, in finding that she was above the age of 16. Mrs. Bonner testified that Eva was born July 26, 1889, and that her mother died May 5, 1894; that she, Mrs. Bonner, kept Eva until fall, when the reeve found a place for her with Mrs. Eastlake.

" She stayed there a year, and then went to Mr. Brown's, the reeve. I don't know how long she stayed at Mr. Brown's. After she left Mr. Brown's, she went to Miss Walker's. I don't know how long she stayed there. I don't know where she went next."

Miss Gable herself testified that she lived with Mrs. Eastlake about a year, and that she remembered distinctly that she lived with Mr. Brown about a year:

"After living with Mrs. Eastlake for a year and Mr. Brown for another year, I lived with Miss Walker for eight years, and then went to live with a family named MacElroy, and came with this family to Michigan last June (June, 1903), and lived with them until they went to Cheboygan. I told Mr. Colbath that, so far as I knew, I was 17 years of age."

It appears from the above testimony that Miss Gable was nearly 5 years old when her mother died, and was past 5 when she went to live with Mrs. Eastlake, and was therefore past 15 years when she went to live with the MacElroy family. How long she lived with the MacElroy family in Canada the record does not disclose; but it appears that she came with them to Michigan in June, 1903, some ten months prior to the offense complained of. If she lived with the MacElroys in Canada 3 or 4 months, the jury might have found from the testimony that she was over the age of 16 on the 9th day of April, 1904. In any event, the jury must have found, if they believed the testimony above set forth to be accurate, that Mrs. Bonner was mistaken as to the date of Eva's birth, the most important fact in issue, and about which Mrs. Bonner alone claimed to testify from personal knowledge.

In view of the great importance of Mrs. Bonner's testimony as to the principal issue of fact, we think respondent's counsel should have been accorded great latitude in cross-examining her, and that the court erred in refusing to allow counsel to question her as to the records referred to heretofore for the purpose of testing her credibility, knowledge, and memory. We also think the court erred in referring to Miss Gable throughout his charge as a "little girl" and a "child," from which expressions the jury might infer that, in the opinion of the court, she was visibly and palpably under the age of 16. We do not consider the remaining assignments of error, for the reason that the occasion for them will probably not arise upon another trial.

The judgment should be reversed, and a new trial granted.

MOORE, C. J., and OSTRANDER, J., concurred with BLAIR, J.